Filed 5/5/15  P. v. Fanning CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ROBERT ARTHUR FANNING,<br><br>    Defendant and Appellant. | D065320<br><br><br><br>(Super. Ct. No. SCD130440) |

APPEAL from an order of the Superior Court of San Diego County, David J. Danielsen, Judge.  Affirmed.

Marianne Harguindeguy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Karl T. Terp, Deputy Attorneys General, for Plaintiff and Respondent.

Robert Arthur Fanning appeals an order denying his petition to recall his indeterminate sentence for indecent exposure (Pen. Code,[1] § 314.1) that was imposed

---

[1]    Statutory references are to the Penal Code.

under the "Three Strikes" law.[2]  He filed a petition to recall his sentence under the "Three

Strikes Reform Act" (the Act or TSRA) enacted in 2012 by the passage of Proposition

36.  (§ 1170.126.)  The trial court denied the petition, finding he posed an unreasonable

risk of danger to public safety.

Fanning contends the court denied his right to due process by misapplying section

1170.126, which "establishes a presumption that an inmate who would not be subject to a

life term under [the Act] must ordinarily be resentenced to a second strike term."  He

further contends the court incorrectly found that he posed an unreasonable risk of danger

to public safety, it failed to apply the proper standard for evaluating the prosecution's

burden of proof under the statute, and it violated his right against self-incrimination by

refusing to resentence him upon its finding he had denied committing the crimes for

which he was convicted.  We conclude the court did not abuse its discretion by finding

that Fanning poses an unreasonable risk of danger to public safety.  Accordingly, we

affirm the order denying Fanning's petition for resentencing.

FACTUAL AND PROCEDURAL BACKGROUND

*Fanning's Criminal History*

Fanning was born in 1949 and has been incarcerated most of his adult life.  When

he was 17, he was committed to the Washington State Department of Institutions,

Division of Juvenile Rehabilitation, based on charges that he was "exposing himself to

---

[2]    An order denying a petition for recall of a sentence under section 1170.126 is appealable.  (*Teal v. Superior Court* (2014) 60 Cal.4th 595, 597.)

2

small children and undressing in public." In 1968, when Fanning was 19 years old, he was first convicted of indecent exposure. He was incarcerated for six years and released on probation.

In 1977, Fanning violated probation by exposing himself to two teenagers and showing them pornography.

In 1984, Fanning was convicted of 38 arson and burglary counts stemming from 26 intentionally set fires of residences between March 1982 and January 1984 in the Clairemont area of San Diego.

In 1993, shortly after he was released from prison, Fanning was seen naked in public. Police chased him but he fled. He was convicted of resisting a peace officer.

In 1994, Fanning was arrested for running nude in the streets. His probation was revoked. He was released from prison in June 1995. A month later, Fanning was seen running naked in downtown San Diego, and his probation was again revoked.

In January 1996, two days after his release from prison, he was observed walking naked in downtown San Diego. He was apprehended as he tried to flee, and he was incarcerated.

In December 1996, Fanning was convicted of indecent exposure following a report he was masturbating in public.

In July 1997, Fanning was seen completely nude on the stairs of the San Diego Convention Center. He told police that since 1993 he had had a severe methamphetamine problem and "his behavior was due to his being under the influence." He was convicted of indecent exposure.

3

In 1998, the court sentenced Fanning to 25 years to life plus one year in prison.

*Fanning's Psychological Evaluation*

In December 2013, at defense counsel's request, psychologist Shayna Gothard interviewed Fanning and administered various psychological tests to him. Among other records, Dr. Gothard reviewed several probation reports outlining Fanning's criminal record: arrest reports, prison records regarding Fanning's training and work tutoring prison inmates, and his involvement in ministry. Dr. Gothard diagnosed Fanning with exhibitionistic disorder, adult antisocial behavior, methamphetamine use disorder that was in sustained remission in a controlled environment, and imprisonment. Dr. Gothard added: "It is possible that Mr. Fanning also carries diagnoses for pyromania and pedophilia though these disorders could not be diagnosed as he denied engaging in the respective behaviors and more information is needed." (Some capitalization omitted.)

Dr. Gothard stated in her report: "[Fanning] was questioned whether he had ever tried to stop exposing himself. He replied, 'not until now.' When asked why the possibility of being arrested was not a deterrent, he stated, 'I always figured I would not get caught.' " During his interview with Dr. Gothard, Fanning continued to deny he caused the fires. Dr. Gothard reported as follows regarding Fanning's treatment efforts and insights: "Mr. Fanning has had limited sex offender and substance abuse treatment. His focus in prison has been to learn how to be a peer educator. As such, he took coursework in peer education for HIV, STD's and worked as a teacher's aide. He also studied extensively with the ministry and continues to go to Bible study." (Some capitalization omitted.)

Dr. Gothard concluded Fanning posed a relatively high risk of reoffending: "[His] extensive history of sexual offenses, arson convictions, limited education and high [Psychopathy Checklist Revised] score is consistent with those in this sample who recidivated. His advanced age was inconsistent with general criminal recidivism."[3] Dr. Gothard elaborated: "Mr. Fanning's history is clearly a significant concern and one that puts him at risk to reoffend. His extensive history of indecent exposure, fire-setting and substance abuse all reflect significant problems with impulse control and impaired judgment. Additionally, his lack of treatment, limited appreciation of his sexual disorder, psychopathic traits, history of substance abuse, and potential exposure to destabilizers place him at further risk. His insight into his past behavior is in the rudimentary stage and in need of a deeper understanding. He also has not developed relapse prevention plans should his urge to use substances or expose himself resurface. [¶] On a positive note, Mr. Fanning has demonstrated no inappropriate behavior, including institutional violations, since his incarceration in 1997. He has also reportedly been sober since his

---

[3]     Specifically, Dr. Gothard reported: "The Psychopathy Checklist Revised (PCL-R) is a clinician completed measure based on a semi-structured interview and extensive review of the records. Its items address both personality and behavioral attributes of psychopaths. Mr. Fanning scored 26 on the PCL-R, placing him at approximately the 59th percentile in relation to other prison inmates on this measure. This score is within the recommended total cutoff of 25-30 as indicative of psychopathy. His score of 9 on Factor 1 of the PCL-R places him at approximately the 53rd percentile on personality characteristics described as the 'selfish, callous and remorseless use of others.' His higher score of 14 on Factor 2 (71st percentile), captures his chronically unstable and antisocial lifestyle. Higher scores on this instrument are associated with an increased risk for violent, assaultive behavior and criminal recidivism after release from prison. Mr. Fanning's scores indicate that he has a number of personality and behavioral psychopathic traits, though more in the realm of antisocial behavior."

arrest and has no desire to resume using. He appreciates the deleterious affect [*sic*] substance abuse has on his functioning and has declined offers to use in custody. Mr. Fanning's advanced age is protective in terms of general criminality though not necessarily sexual offending. However, by self-report, his libido and sexual functioning have been adversely affected by his age, health challenges and medication, which could reduce his urges. He has also begun to gain insight into the inappropriateness of his sexual behavior and the disturbing affect [*sic*] on the victims. Lastly, Mr. Fanning has been highly involved in the ministry and wants to live by Christian tenants [*sic*]. [¶] In sum, though Mr. Fanning has exhibited no recent inappropriate behaviors, has been sober for the past 16 years, and has begun to gain insight into his behavior, there are still a number of factors which place him at a relatively high risk for re-offense, especially of [*sic*] indecent exposure." (Some capitalization omitted.)

*The Court's Denial of Fanning's Petition*

The court relied on the parties' briefs and several documents including Dr. Gothard's report, information regarding Fanning's criminal conviction history, Fanning's disciplinary record and his record of rehabilitation while in prison. The court noted that Fanning's "commitment offense, standing by itself, would not be enough simply to say he's an unreasonable risk of danger to society." It also concluded Fanning's "disciplinary record and all of the information from inside the institution actually is quite favorable to Mr. Fanning." Nonetheless, it denied the petition: "[Fanning] is at a significantly high risk to reoffend, and that's not entirely based solely upon the history. . . . [¶] You put that in combination of what I think are the critical facts, and that is that he has had no

6

significant effective treatment, his appreciation of his sexual disorder is extraordinarily limited, he has antisocial traits, he has a significant history of substance abuse, and putting him back out into society, I think clearly would put him in a position of exposure to facts and circumstances that could be characterized as destabilizers. [¶] Given his insight or lack thereof of his past behavior, his denial of some of his past behavior, his failure to develop reasonable relapse prevention programs all lead this court to believe that at this time that if he were released by virtue of a resentencing, he would, in fact, pose an unreasonable risk of danger to public safety. [¶] If he is to be released in the future, it would be based upon parole determinations in the ordinary course."

## DISCUSSION

Fanning challenges the court's denial of his petition on multiple grounds. Contending the People bore the burden of proving his dangerousness beyond a reasonable doubt, Fanning states the court was "insistent that his current dangerousness was tied to his denial of guilt for the acts of arson for which he was convicted in 1985. . . . [¶] In essence what the court was requiring was that [he] testify against himself as a condition for resentencing . . . [in violation of ] the Fifth and Fourteenth amendments." He also contends "[t]he court denied resentencing primarily on the grounds that the mere fact of [his] criminal history is indicative of his current 'unreasonable' level of dangerousness." He further contends: "At the time of appellant's hearing he was 64 years old, meaning that his self-confessed history of sexual abuse ended 46 years ago. The court did not mention or consider the remoteness of these crimes during the hearing." Fanning concedes he "has had limited substance abuse and sex offender treatment in prison," but

7

claims that is because of "his reluctance to discuss the nature of his crimes while in there. However, it is clear from [his] sobriety and good behavior that he has developed alternative methods for relapse prevention." Fanning summarizes: "The trial court failed to consider the facts most probative on dangerousness, including [his] 16 years of good behavior and work evaluations, the remoteness of his 1984 violent felony, his age of 64, his medical disability, his psychological evaluation results and fiscal consequences [of his continued incarceration]." (Some capitalization omitted.)

I.

*General Legal Principles*

"[T]here are two parts to the Act: the first part is *prospective* only, reducing the sentence to be imposed in future three strike cases where the third strike is not a serious or violent felony (Pen. Code, §§ 667, 1170.12); the second part is *retrospective*, providing *similar*, *but not identical*, relief for prisoners already serving third strike sentences in cases where the third strike was not a serious or violent felony (Pen. Code, § 1170.126)." (*People v. Superior Court* (*Kaulick*) (2013) 215 Cal.App.4th 1279, 1286 (*Kaulick*).)

"[U]nder the retrospective part of the Act, if the prisoner's third strike offense was not serious or violent, and none of the enumerated exceptions applies, the defendant 'shall be' sentenced as if the defendant had only a single prior strike, 'unless the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety.' (Pen. Code, § 1170.126, subd. (f).)" (*Kaulick, supra,* 215 Cal.App.4th at p. 1293, fn. omitted; see also § 1170.126, subd. (e).) The Act provides a

8

means whereby prisoners currently serving sentences of 25 years to life for a third felony conviction, which was not a serious or violent felony, may seek court review of their indeterminate sentences and, under certain circumstances, obtain resentencing as if they had only one prior serious or violent felony conviction and was thus a second-strike, rather than a third-strike, offender. (*Kaulick, supra,* at p. 1286.)

If the inmate satisfies the statutory criteria and is eligible for resentencing (§ 1170.126, subds. (e), (f)), the trial court "shall" resentence the inmate "unless the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety." (§ 1170.126, subd. (f).) "In exercising its discretion in subdivision (f), the court may consider: [¶] (1) The petitioner's criminal conviction history, including the type of crimes committed, the extent of injury to victims, the length of prior prison commitments, and the remoteness of the crimes; [¶] (2) The petitioner's disciplinary record and record of rehabilitation while incarcerated; and [¶] (3) Any other evidence the court, within its discretion, determines to be relevant in deciding whether a new sentence would result in an unreasonable risk of danger to public safety." (§ 1170.126, subd. (g).)

## II.

### *The Burden of Proof Claim*

Fanning argues that, under *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490, the prosecution must prove the dangerousness factor beyond a reasonable doubt. He contends the court's failure to apply this standard violated his due process rights.

This precise claim has been rejected by the courts in *Kaulick, supra,* 215 Cal.App.4th 1279 and *People v. Osuna* (2014) 225 Cal.App.4th 1020 (*Osuna*). The *Osuna* court, relying in part on *Kaulick*, "conclude[d] disqualifying factors need not be proven to a jury beyond a reasonable doubt where eligibility for resentencing under section 1170.126 is concerned." (*Osuna,* at p. 1038, fn. omitted.) *Osuna* held "*Apprendi* and its progeny do not apply to a determination of eligibility for resentencing under the Act" (*Osuna,* at p. 1039) because "[a] finding an inmate is not eligible for resentencing under section 1170.126 does not increase or aggravate that individual's sentence; rather, it leaves him or her subject to the sentence originally imposed." (*Osuna,* at p. 1040.) Similarly, *Kaulick* concluded that "dangerousness is not a factor which enhances the sentence imposed when a defendant is resentenced under the Act; instead, dangerousness is a hurdle which must be crossed in order for a defendant to be resentenced at all. If the court finds that resentencing a prisoner would pose an unreasonable risk of danger, the court does not resentence the prisoner, and the petitioner simply finishes out the term to which he or she was originally sentenced. [¶] . . . As such, a court's discretionary decision to decline to modify the sentence in his favor can be based on any otherwise appropriate factor (i.e., dangerousness), and such factor need not be established by proof beyond a reasonable doubt to a jury." (*Kaulick,* at p. 1303, fn. omitted.)

We agree with the analysis of *Kaulick* and *Osuna* and conclude the retrospective part of the Act is not constitutionally required, but instead represents an act of lenity on the part of the electorate permitting the potential for the original sentence to be modified downward. Facts found at such a proceeding, including the factor of dangerousness, do

10

not implicate Sixth Amendment issues and need not be proved beyond a reasonable doubt.

## III.

### *Sufficiency of the Evidence*

*Standard of Review*

Section 1170.126, subdivision (f), provides that a petitioner shall not be resentenced if "the court, *in its discretion*, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety."  (Italics added.)  By its plain language, subdivision (f) of section 1170.126 leaves the determination of whether resentencing would present an unreasonable risk of danger to public safety to the trial court's discretion.  This conclusion finds further support in subdivision (g) of this same statute, which provides in part that a court may consider various enumerated factors "[i]n exercising *its discretion* in subdivision (f)."  (Italics added.)

The appropriate standard of review involves two distinct but interdependent steps. The first step requires the People to carry the burden of proving, by a preponderance of the evidence, the facts on which a finding that resentencing a petitioner would pose an unreasonable risk of danger to public safety reasonably can be based, and that appellate review of those facts is based on the substantial evidence standard.  However, the preponderance of the evidence standard does not apply to the trial court's determination regarding dangerousness.  Instead, the ultimate decision of whether resentencing an inmate would pose an unreasonable risk of danger to public safety is within the sound discretion of the trial court, and therefore its finding must be upheld if it does not

11

constitute an abuse of discretion, that is, if it falls within the bounds of reason, all of the circumstances being considered. This construction comports with the plain language of section 1170.126, subdivision (f), that a petitioner shall not be resentenced if "the court, *in its discretion*, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety." (Italics added.)

*Analysis*

We conclude the court's exercise of discretion contains ample support in the record. Fanning has a lengthy record of prior offenses, including arson of several residences and various acts of exhibitionism. Moreover, his record demonstrates a marked inability to remain law-abiding during the brief periods when he was free from incarceration. The psychologist found Fanning posed a high risk for recidivism based on his prior crimes, his "rudimentary" insights into the basis for his criminal conduct, his failure to receive treatment during his incarceration, and his lack of a relapse prevention plan. In light of the substantial evidence in the record, it is of no moment that the court in its ruling did not expressly refer to Fanning's advanced age and the fact his prior strikes were committed when he was 34 years old, or any other factor which would have favored the granting of Fanning's petition.

Despite Fanning's criticism of the trial court's ruling as violating his right against self incrimination, we note the court did not require Fanning to testify. We conclude it had sufficient basis for its decision in the psychologist's report, and it merely acknowledged that Fanning's prospects for rehabilitation and his level of public danger were tied to a recognition of his involvement in committing the arsons; therefore,

considering Fanning's decision to deny his role in the crime, the court was entitled to conclude Fanning would continue to pose an unreasonable risk of danger to the public if released. Moreover, contrary to Fanning's claim, the court manifestly did not limit itself to reciting Fanning's "criminal behavior as grounds for denial of resentencing." Rather, the court was more persuaded by Fanning's lack of insight into his criminal conduct or plan to address the stressors that might arise upon his release, which would increase Fanning's risk of reoffending, putting the public in unreasonable danger. On this record the trial court's concern was warranted.

## IV.

### *The Proposition 47 Claim*

Fanning in his reply brief raises a new argument for reversal, asserting the newly enacted provisions of Proposition 47, by adding section 1170.18, redefined the standard for determining whether an inmate poses an unreasonable risk of danger to public safety for purposes of resentencing under the TSRA. Fanning argues that, when this new definition is applied to his application under the TSRA, there is no substantial evidence to support the court's finding that he would pose an unreasonable risk of danger to public safety.[4] He specifically states: "In this case the trial court considered the nonviolent offenses and behaviors in determining future dangerousness which would not be relevant under this new definition of 'unreasonable risk of danger to public safety[.]' The trial court indicated that part of the history [it] considered was indecent exposure, his

---

4       Fanning does not address, and we express no opinion on, whether he might be eligible to bring a petition for recall under Proposition 47.

13

substance abuse and his 'sexual abuse[.]' " We conclude our substantial analysis set forth above is unaffected by Proposition 47.

On November 4, 2014, voters enacted Proposition 47, which became effective the next day. (Cal. Const., art. II, § 10, subd. (a).) The focus of Proposition 47 was to render misdemeanors a class of certain drug- and theft-related offenses that previously were felonies or "wobblers," unless they were committed by certain ineligible defendants. Proposition 47 also created a new resentencing provision—section 1170.18—analogous to the resentencing provisions of the TSRA, and permitted a person currently serving a felony sentence for an offense that is now a misdemeanor to petition for a recall of that sentence and request resentencing in accordance with the offense statutes as added or amended by Proposition 47. (§ 1170.18, subd. (a).)

Among the lengthy provisions of Proposition 47, as presented to and adopted by the voters, is subdivision (c) of section 1170.18, the provision on which Fanning relies in the present appeal. That subdivision provides: "As used throughout this Code, 'unreasonable risk of danger to public safety' means an unreasonable risk that the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667" (§ 1170.18, subd. (c)), thereby incorporating by reference section 667, subdivision (e)(2)(C)(iv)'s list of particularly heinous felonies. Fanning asserts section 1170.18, subdivision (c), now limits a trial court's discretion to deny resentencing under the TSRA to those cases in which resentencing the defendant would pose an unreasonable risk he or she will commit one of the listed particularly heinous felonies and, because there was no substantial

14

evidence to support a finding Fanning posed an unreasonable risk of committing one of the listed particularly heinous felonies, he argues the trial court's order must be reversed.

Our task is one of statutory construction.[5] Although the TSRA and Proposition 47 employ similar language, this does not inexorably require that the definition contained in section 1170.18, subdivision (c), must be read into section 1170.126, subdivision (f), because "[t]he literal language of a statute does not prevail if it conflicts with the lawmakers' intent" (*Osuna, supra,* 225 Cal.App.4th at p. 1033), nor will the " 'apparent purpose of a statute . . . be sacrificed to a literal construction.' " (*Cossack v. City of Los Angeles* (1974) 11 Cal.3d 726, 733.) Rather, we must construe the statute in accord with its purpose, and a court should not construe the language of a statute in its literal sense if doing so "would result in absurd consequences that the [voters] did not intend" (*In re Michele D.* (2002) 29 Cal.4th 600, 606), or would "frustrate[ ] the manifest purposes of the legislation as a whole." (*People v. Williams* (1992) 10 Cal.App.4th 1389, 1393.) "To this extent, therefore, intent prevails over the letter of the law and the letter will be read in accordance with the spirit of the enactment." (*Michele D.*, at p. 606.)

We therefore consult " 'a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy,

---

5      We note the California Supreme Court has recently granted review to determine whether the definition of "unreasonable risk of danger to public safety" under Proposition 47 applies to resentencing under the TSRA. (*People v. Valencia* (2014) 232 Cal.App.4th 514, review granted Feb. 18, 2015, No. S223825, 183 Cal.Rptr.3d 516.)  Pending direction from the Supreme Court, we must reach the issue here.

15

contemporaneous administrative construction, and the statutory scheme of which the statute is a part.  [Citations.]' [Citation.]  We also ' "refer to other indicia of the voters' intent, particularly the analyses and arguments contained in the official ballot pamphlet." ' " (*Osuna, supra,* 225 Cal.App.4th at p. 1034.)  With these extrinsic aids, we " ' "select the construction that comports most closely with the apparent intent of the [electorate], with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." ' " (*Id.* at pp. 1034-1035.)

Although the TSRA and Proposition 47 address related subjects, they target such different subjects that we conclude Proposition 47's literal meaning would not comport with the purpose of the TSRA, and applying it to resentencing proceedings under the TSRA would frustrate, rather than promote, that purpose and the intent of the electorate in enacting both initiative measures.  First, as is evidenced by its title, the TSRA was aimed solely at revising a law—the three strikes law—the principal focus of which was to punish recidivism with more severe sentences.  (See, e.g., *People v. Cooper* (1996) 43 Cal.App.4th 815, 823-824.)  Just a few months before the November 6, 2012 election at which the TSRA was passed, the California Supreme Court recognized that "[o]ne aspect of the [three strikes] law that has proven controversial is that the lengthy punishment prescribed by the law may be imposed not only when . . . a defendant [who has previously been convicted of one or more serious or violent felonies] is convicted of another serious or violent felony but also when he or she is convicted of any offense that is categorized under California law as a felony.  This is so even when the current, so-

16

called triggering, offense is nonviolent and may be widely perceived as relatively minor."

(*In re Coley* (2012) 55 Cal.4th 524, 528-529.)

When voters approved the TSRA, they resolved this controversy in favor of strike offenders. In one of the "Findings and Declarations" of the TSRA, the voters approved the declaration that the TSRA would "[r]estore the Three Strikes law to the public's original understanding by requiring life sentences only when a defendant's current conviction is for a violent or serious crime." (Cal. Voter Information Guide, Gen. Elec. (Nov. 6, 2012) text of Prop. 36, § 1, p. 105, at <http://www.voterguide.sos.ca.gov/past/2012/general/propositions> [as of Apr. 29, 2015] (hereafter Information Guide I).) Nowhere, however, do the ballot materials for the TSRA suggest voters understood or intended the TSRA would require resentencing of qualified third strike offenders in all but the most egregious cases, as would be the result if the definition of " 'unreasonable risk of danger to public safety' " contained in section 1170.18, subdivision (c), were engrafted onto resentencing proceedings under the TSRA. That voters did not intend such a result is amply demonstrated by the fact an indeterminate life term remained mandatory under the TSRA for a wide range of current offenses even if the offender does not have a prior conviction for a particularly heinous offense (§§ 667, subd. (e)(2), 1170.12, subd. (c)(2)), and an inmate is rendered ineligible for resentencing under section 1170.126 for an array of reasons beyond his or her having suffered such a prior conviction (see § 1170.126, subd. (e)(2)).

When voters adopted the reforms of the TSRA, that enactment was still presented as placing public safety first, even though there were also cost savings likely to accrue as

17

a result of its enactment. Thus, uncodified section 7 of the Act provides: "This act is an exercise of the public power of the people of the State of California for the protection of the health, safety, and welfare of the people of the State of California, and shall be liberally construed to effectuate those purposes." (Information Guide I, *supra,* text of Prop. 36, p. 110, original italics omitted.) As explained in *People v. Osuna, supra,* 225 Cal.App.4th at p. 1036, "[a]lthough the [TSRA] 'diluted' the three strikes law somewhat [citation], '[e]nhancing public safety was a key purpose of the Act.' "

In contrast, Proposition 47 emphasized monetary savings. The "Findings and Declarations" state: "The people of the State of California find and declare as follows: [¶] The people enact the Safe Neighborhoods and Schools Act to ensure that prison spending is focused on violent and serious offenses, to maximize alternatives for nonserious, nonviolent crime, and to invest the savings generated from this act into prevention and support programs in K–12 schools, victim services, and mental health and drug treatment. This act ensures that sentences for people convicted of dangerous crimes like rape, murder, and child molestation are not changed." (Cal. Voter Information Guide, Gen. Elec. (Nov. 4, 2014) text of Prop. 47, § 2, p. 70, at <http://www.voterguide.sos.ca.gov/en/propositions/47> [as of Apr. 29, 2015] (hereafter Voter Information Guide II.) Proposition 47 requires misdemeanor sentences for various drug possession and property offenses, unless the perpetrator has a prior conviction for a particularly heinous offense or for an offense requiring sex offender registration pursuant to section 290, subdivision (c). (Health & Saf. Code, §§ 11350, subd. (a), 11357, subd. (a), 11377, subd. (a); Pen. Code, §§ 459.5, subd. (a), 473, subd. (b), 476a, subd. (b),

18

490.2, subd. (a), 496, subd. (a), 666, subd. (b).) Penal Code section 1170.18 renders ineligible for resentencing only an inmate whose current offense would now be a misdemeanor, but who has a prior conviction for a particularly heinous offense or for an offense requiring sex offender registration pursuant to Penal Code section 290, subdivision (c). (Pen. Code, § 1170.18, subds. (a), (i).)

Nowhere in the ballot materials for Proposition 47 were voters given any indication that initiative, which dealt with offenders whose current convictions would now be misdemeanors rather than felonies, had any impact on the TSRA, which dealt with offenders whose current convictions would still be felonies. For instance, the "Official Title and Summary" stated, in pertinent part, that Proposition 47 would "[r]equire[ ] resentencing for persons serving felony sentences for these offenses[, i.e., offenses that require misdemeanor sentences under the measure] unless court finds unreasonable public safety risk." (Voter Information Guide II, *supra,* official title and summary of Prop. 47, p. 34.) In explaining what Proposition 47 would do, the Legislative Analyst stated: "This measure reduces penalties for certain offenders convicted of nonserious and nonviolent property and drug crimes. This measure also allows certain offenders who have been previously convicted of such crimes to apply for reduced sentences." (Voter Information Guide II*, supra,* analysis of Prop. 47 by Legis. Analyst, p. 35.) With respect to the resentencing provision, the Legislative Analyst explained: "This measure allows offenders *currently serving felony sentences for the above crimes* [, i.e., grand theft, shoplifting, receiving stolen property, writing bad checks, check forgery, and drug possession] to apply to have their felony sentences

19

reduced to misdemeanor sentences.  In addition, certain offenders who have already completed a sentence for a felony that the measure changes could apply to the court to have their felony conviction changed to a misdemeanor.  However, no offender who has committed a specified severe crime could be resentenced or have their conviction changed.  In addition, the measure states that a court is not required to resentence an offender currently serving a felony sentence if the court finds it likely that the offender *will commit a specified severe crime.*  Offenders who are resentenced would be required to be on state parole for one year, unless the judge chooses to remove that requirement." (*Id.* at p. 36, italics added.)

Similarly, the arguments in favor of and against Proposition 47 spoke in terms solely of Proposition 47, and never mentioned the TSRA.  The argument in favor of Proposition 47 spoke in terms of prioritizing serious and violent crime so as to stop wasting prison space "on petty crimes," stop "wasting money on warehousing people in prisons for nonviolent petty crimes," and stop California's overcrowded prisons from "incarcerating too many people convicted of low-level, nonviolent offenses."  (Voter Information Guide II*, supra,* argument in favor of Prop. 47, p. 38.)  The rebuttal to argument against Proposition 47 reiterated these themes, and never suggested Proposition 47 would have any effect on resentencing under the TSRA.  (See Voter Information Guide II, *supra,* rebuttal to argument against Prop. 47, p. 39.)  Although the rebuttal to argument in favor of Proposition 47 asserted 10,000 inmates would be eligible for early release under the measure, and that many of them had prior convictions "for serious crimes, such as assault, robbery and home burglary" (Voter Information Guide II, *supra,*

rebuttal to argument in favor of Prop. 47, p. 38), there is no suggestion the early release provisions would extend to inmates whose current offenses remained felonies under the TSRA. The same is true of the discussion of resentencing contained in the argument against Proposition 47. (Voter Information Guide II, *supra,* argument against Prop. 47, p. 39.)

In light of the foregoing, we cannot reasonably conclude voters intended the definition of " 'unreasonable risk of danger to public safety' "contained in section 1170.18, subdivision (c), to apply to that phrase as it appears in section 1170.126, subdivision (f), despite the former section's preamble, "As used throughout this Code." Voters cannot intend something of which they are unaware.

Additionally, as a matter of statutory construction, we note the TSRA's sunset clause effectively precluded most new applications for relief under the TSRA after November 7, 2014 (see § 1170.126, subd. (b)), while Proposition 47 (and its newly enacted definitional provisions under section 1170.18, subdivision (c)) took effect on November 5, 2014 (Cal. Const., art. II, § 10, subd. (a)), which would provide only a two-day window during which an applicant under the TSRA would reap the benefits of the more restrictive "dangerousness" definitions adopted by Proposition 47. As an additional matter of statutory construction, we decline to ascribe to the electorate an intent to overlay a definitional amendment onto a remedial scheme that effectively expired two days after the definitional amendment would have taken effect.

Finally, and again as a matter of statutory construction, adopting Fanning's interpretation of the intended scope of section 1170.18, subdivision (c), would present

21

serious questions under the equal protection clauses of the United States and California Constitutions. Specifically, under Fanning's construction, the more restrictive "dangerousness" definition adopted by Proposition 47 would apply only to applicants who invoked the TSRA during the two-day window when both were in effect or (assuming retroactivity)[6] to a slightly larger class of applicants under the TSRA whose matters were not yet final before the effective date of Proposition 47. However, the more restrictive "dangerousness" definition adopted by Proposition 47 would provide no benefit to those applicants who, although identically situated to Fanning, had their TSRA applications denied and which denials became final before November 5, 2014. "Both the United States Supreme Court and the California courts have pointed out on numerous occasions that a court, when faced with an ambiguous statute that raises serious

---

6      However, different courts of appeal have concluded that even if Proposition 47's definition of an "unreasonable risk of danger to public safety" applied prospectively to applications under the TSRA, it did not apply retrospectively to applications denied before the effective date of Proposition 47. (*People v. Chaney* (2014) 231 Cal.App.4th 1391, review granted February 18, 2015, S223676 [does the definition of "unreasonable risk of danger to public safety" under section 1170.18, subdivision (c) apply retroactively to resentencing under section 1170.126].) Two other cases decided after *Chaney* also addressed this question, and both declined to retroactively apply the section 1170.18, subdivision (c) definition of " 'unreasonable risk of danger to public safety' " to resentencing under section 1170.126. (*People v. Davis* (2015) 234 Cal.App.4th 1001, 1006 (*Davis*); *People v. Guzman* (2015) 235 Cal.App.4th 847 (*Guzman*) (maj. opn. at pp 855-856 [definition under section 1170.18, subdivision (c) does not apply to resentencing under section 1170.126]); see *id*. at p. 861 (conc. opn. of Aronson, J.) [definition under section 1170.18, subdivision (c) does apply to resentencing under section 1170.126, but not retroactively].) We agree with *Davis* and *Guzman* on this question. And we too conclude "that the five words 'As used throughout this Code' were not intended by the voters to hamstring the [TSRA]." (*Davis, supra,* 234 Cal.App.4th at p 1026.) Accordingly, we deny Fanning's request, raised at oral argument, for an opportunity to make further arguments on issues related to Proposition 47 and retroactivity.

constitutional questions, should endeavor to construe the statute in a manner which *avoids* any doubt concerning its validity." (*Carlos v. Superior Court* (1983) 35 Cal.3d 131, 147, fn. omitted, overruled on other grounds in *People v. Anderson* (1987) 43 Cal.3d 1104, 1147.) Our construction of Proposition 47's provisions avoids potential equal protection infirmities of its provisions by limiting its application to applicants under Proposition 47's remedial scheme.

## DISPOSITION

The order is affirmed.


O'ROURKE, J.

WE CONCUR:

BENKE, Acting P. J.

HALLER, J.